<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

IN RE JOHNSON & JOHNSON SECURITIES
LITIGATION

Civ. No. 02-3534 (WGB)

**O P I N I O N**

---

**<u>APPEARANCES</u>:**

Gary S. Graifman, Esq.
Benjamin Benson, Esq.
**KANTROWITZ, GOLDHAMER & GRAIFMAN**
210 Summit Avenue
Montvale, New Jersey 07645

    Liaison Counsel for Plaintiffs

Jules Brody, Esq.
Howard T. Longman, Esq.
Aaron Brody, Esq.
Tzivia Brody, Esq.
**STULL, STULL & BRODY**
6 East 45th Street
New York, New York 10017

    Lead Counsel for Plaintiffs

Jeffrey J. Greenbaum, Esq.
Steven D. Gorelick, Esq.
**SILLS CUMMIS RADIN TISCHMAN EPSTEIN & GROSS, P.A.**
One Riverfront Plaza
Newark, New Jersey 07102

    Of Counsel for Defendants

Gregory L. Diskant, Esq.
Erik Haas, Esq.
**PATTERSON BELKNAP & TYLER LLP**
1133 Avenue of the Americas

1

New York, New York 10036

        Counsel for Defendants

Joseph G. Braunreuther, Esq.
**JOHNSON & JOHNSON LAW DEPARTMENT**
One Johnson & Johnson Plaza
New Brunswick, New Jersey 08933

        Counsel for Defendants

**BASSLER, DISTRICT JUDGE:**

        Plaintiffs brought this suit as a class action on behalf of purchasers of the publicly traded securities of Johnson & Johnson ("J&J") during the period from April 16, 2002 through July 18, 2002 (the "Class Period").  Plaintiffs allege material omissions and misrepresentations by J&J, in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

        In addition, Plaintiffs name as defendants four present or former officers of J&J (the "Individual Defendants"), pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, for their alleged participation in the non-disclosure.[1]

        J&J and the Individual Defendants (collectively, the "Defendants") move to dismiss Plaintiffs' Consolidated Amended Class Action Complaint (the "Amended Complaint") pursuant to

---

        [1]    The Individual Defendants are: Ralph S. Larsen, William C. Weldon, James T. Lenehan, and Robert N. Wilson.

2

Federal Rule of Civil Procedure 12(b)(6).  The Court held oral argument on Defendants' motion to dismiss on June 24, 2004.

This Court properly exercises jurisdiction over this action pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331.  Venue is appropriate under 15 U.S.C. § 78aa and § 1391.

For the reasons set forth below, Defendants' motion to dismiss is **GRANTED**.


I.     **FACTUAL BACKGROUND**

       **A.   Eprex**

J&J manufactures and sells Eprex, an anemia drug formulated from erythropoietin, or "Epo," a human hormone that stimulates red blood cell production.  (Amended Compl., at ¶ 31.)  J&J manufactures bulk Epo in Puerto Rico, and then sends the bulk Epo to Europe for use in the formulation and packaging of Eprex.  Eprex is sold exclusively in Europe and Canada.  Procrit is a drug similar to Eprex, but is sold by J&J in the United States.  (Id. at ¶ 31.)  In 2001, Eprex and Procrit were J&J's best-selling products, accounting for 10.4% of total revenue.  In 2002, revenue from the two drugs grew by 24% to reach $4.3 billion.  (Id. at ¶ 32.)

Beginning in 1999, doctors in Europe began reporting autoimmune reactions in a small number of patients who had been using Eprex.  These patients developed pure red blood cell

aplasia, or "PRCA," a potentially deadly disorder in which patients lose the ability to make red blood cells, thus worsening the patient's anemic condition.  (Id. at ¶ 37.)

On November 19, 2001, J&J issued a "Dear Doctor" letter to physicians in Europe, advising them that new safety information concerning PRCA would be added to the Eprex label.  (Id. at ¶ 39.)

From December 2001 through mid-2002, various news articles reported on PRCA and on its potential significance to sales of Eprex and other anemia drugs. (Id. at ¶¶ 40, 43, 63, 64.)

During this period, J&J made several public statements that it had inspected its plant in Puerto Rico and had not uncovered any manufacturing deficiencies.  (Id. at ¶ 42.) On December 4, 2001, a J&J spokesperson was quoted in a Dow Jones News Service article as stating, "[w]e have not uncovered any causative factors to date . . . [w]e are continuing to investigate what the source of the problem is."  (Id.)  In J&J's January 2002 press releases and conference calls concerning its financial results, J&J continued to note the strong performance of Eprex and Procrit. (Id. at ¶¶ 45, 46.)

On February 14, 2002, the Wall Street Journal reported that "J&J's blockbuster anti-anemia drug Eprex appears to have caused a rare, potentially fatal blood disorder in a small cluster of European patients, scientists report in today's New England

4

<u>Journal of Medicine</u>."  According to a J&J spokesperson quoted in the article, "[a]n extensive internal review has found no problems at the company's Puerto Rico manufacturing plant, where the drug is made under license from Amgen Inc."  (<u>Id.</u> at ¶ 50.) The same spokesperson was quoted that day in <u>TheStreet.com</u> as stating: "No cause and effect between Eprex and pure red cell aplasia has been proven yet, but we're working with regulatory authorities to examine a number of different factors."  According to the news article, "[t]hese factors could be external -- the way the drug is made, stored or administered -- or it could be something endemic to Eprex's chemical makeup. [J&J's spokesperson] says the company will not speculate on the exact cause until more research is done."  (<u>Id.</u> at ¶ 51.)

**B.   J&J's Allegedly False and Misleading Statements**

On April 16, 2002, the beginning of the Class Period, J&J issued a press release announcing its first quarter financial results.  The press release stated that "[s]ales growth reflects the strong performance of PROCRIT/EPREX, for the treatment of anemia . . ."  (<u>Id.</u> at ¶ 52.)  That same day, J&J held a conference call with securities analysts concerning first quarter financial results and commented on the PRCA issue as follows:

> In terms of [pure red blood cell aplasia] in Europe, I think the first thing to emphasize and its probably inherent in your comment that Eprex (ph) continues to be a trusted brand that people are using.  In fact, its growing.

5

> Is that [pure red blood cell aplasia] is a
> inaudible (ph).  It's been seen with Eprex
> (ph) but it's also been seen with other EPO
> (ph)products outside of the U.S.  It occurs
> in about one in 10,000 patients.
>
> And when you weigh that against the
> overwhelming efficacy benefit in a - in a
> variety of conditions that Eprex (ph) is used
> in, both health authorities that we've been
> working very closely with, as well as our
> customers and opinion leaders in the fields
> feel very confident about the product and the
> safety of the product moving forward.
>
> What we are doing, though, is working very
> closely with the - with the experts, as well
> as health authorities in understanding [pure
> red cell aplasia] (ph), why it occurs.  And
> we're doing whatever we can to understand the
> risk and mitigate it.

(Id. at ¶ 53.)

On May 14, 2002, J&J filed its Form 10-Q for the quarter
ended March 31, 2002 containing the financial information
previously released on April 16, 2002.  (Id. at ¶ 54.)

Plaintiffs do not allege that J&J's statements concerning
growth in sales and earnings, including statements associating
that growth with expanded sales of Exprex and Procrit, were
untrue.  (Id. at ¶¶ 42, 50, 51, 53.)  Neither do Plaintiffs
contend that J&J failed to adequately disclose the issue of PRCA.
Rather, Plaintiffs claim that by the beginning of the Class
Period, J&J should have disclosed: (1) a qui tam action filed
against J&J in March 2000 by a former employee; and (2) a
subsequent Food and Drug Administration investigation of the

6

allegations in the lawsuit.  (Id. at ¶ 55.)

### C.   The Qui Tam Action and FDA Investigation

In March 2000, Hector Arce, a former boiler maker at J&J's manufacturing plant in Puerto Rico, brought a wrongful termination and qui tam action against J&J in federal district court in Puerto Rico, alleging that his supervisors coerced him into falsifying data in order to cover up manufacturing lapses at the plant.  Arce contended that he was wrongfully terminated for raising these allegations and for threatening to report them to the FDA.  (Id. at ¶ 44.)  Arce did not claim that there was any connection between the alleged manufacturing lapses and the issue of PRCA.

After Arce filed the qui tam action, the United States Attorney's Office declined to intervene in the lawsuit.  (Id., at ¶ 71.)  By April 2002, however, J&J learned that the FDA's Office of Criminal Investigation had sought a stay of the qui tam action in order to investigate Arce's allegations of false documentation.  (Id., at ¶ 57.)

### D.   Public Disclosure of the Qui Tam Action and the FDA Investigation

The FDA criminal investigation and the underlying qui tam action were not publicly disclosed until July 19, 2002, when the New York Times reported the following:

> The government is conducting a criminal
> investigation into a Johnson & Johnson
> factory that makes an anemia drug that has

7

been linked to a spate of serious illnesses
in Europe and Canada, according to court
documents and people close to the situation.

The factory, in Puerto Rico, manufactures
Eprex, a drug that is used to increase the
levels of red blood cells in people who are
undergoing kidney dialysis or suffering from
anemia caused by chemotherapy.

. . . The investigation, by the Food and Drug
Administration and the Justice Department, is
tied to a whistle-blower lawsuit filed
against Johnson & Johnson by Hector Arce, a
former employee at the factory.  Mr. Arce,
who was fired in March 1999, contends he was
pressed to falsify data to cover up
manufacturing lapses and then was suspended a
few days before an expected interview with
FDA inspectors.

Johnson & Johnson denies the accusations.  It
said Mr. Arce was a boiler operator not
directly involved in the manufacture of Eprex
and that he was fired for numerous violations
of company procedures and for dishonesty.

"We investigated the allegations, and we
found no support for them," said Carol
Goodrich, a spokeswoman for Johnson &
Johnson.  "Even if they were true, they would
not have affected the product integrity."

But Ms. Goodrich said the company was "aware
of an investigation by the FDA presumably
related to the lawsuit."  She said the
company did not know the precise nature of
the investigation but intended to cooperate.
The FDA did not comment.

Over the past few months, Jaime Pieras, Jr.,
the judge presiding over the lawsuit in the
United States District Court in Puerto Rico,
has twice ordered the government to file
reports under seal "regarding the status of
its criminal investigation."  And Juan H.
Saavedra, a lawyer for Mr. Arce, said, "[t]he
case had been stayed pending this criminal

> investigation."
>
> It is unclear whether the government suspects that manufacturing violations are responsible for the illnesses suffered by Eprex patients. A person close to the situation said, however, that the government became active only this spring as concern about the illnesses grew.  A year earlier, the government had declined to intervene in the lawsuit.

(<u>Id.</u> at ¶ 71.)  Later that same day, J&J issued a press release stating:

> [I]n April, Johnson & Johnson became aware that the U.S. Food and Drug Administration's Office of Criminal Investigation sought a stay of a civil case filed by a former Johnson & Johnson employee in order to investigate the employee's allegations regarding false documentation.  Upon learning of the government's interest in the case, we actively contacted the U.S. Attorney's Office and the FDA's Center for Biologics to offer them information and our complete cooperation.

(<u>Id.</u> at ¶ 72.)

Following the publication of the <u>New York Times</u> article and J&J's press release, the price of J&J's common stock dropped 16%, falling $7.88 to close at $41.85.  (<u>Id.</u> at ¶ 73.)  Citing the <u>New York Times</u> article specifically, analysts at banks such as Merrill Lynch lowered their ratings of J&J on July 19, 2002 from "strong buy" to "buy."  (<u>Id.</u> at ¶ 74.)

On July 20, 2002, the <u>New York Times</u> reported:

> Asked why Johnson & Johnson had not disclosed

> the criminal investigation, he said it was
> because the company considered it immaterial.
> 'We had a disgruntled ex-employee making
> these allegations,' he said.  'The company
> looked into them thoroughly and concluded
> they were baseless.  And there was never any
> conceivable connection between the
> allegations he was making and product
> integrity.'  He also said that just because
> there was an investigation did not mean
> anything could result from it.

(Id. at ¶ 95.)

On the day following the July 19, 2002 stock drop, J&J's stock price began to recover.  By July 29, 2002, six trading days after the stock price drop, J&J's stock closed at $51.26 – above the stock's July 18 closing price of $49.73.

In August 2002, the government declined to intervene in the qui tam action and advised the Court that it was not interested in an additional stay of the proceedings.

In June 2003, the district court dismissed the qui tam action at the request of the parties to the lawsuit.

### E.   Procedural Background

Plaintiffs filed the complaint in this action on July 23, 2002, four days after the July 19 stock drop.  On December 27, 2002, this Court appointed John Dubois, Arthur Harrison, JEI Metallurgical Money Purchase Plan, Dustin Moulton, and Hans Von Bernthal Lead Plaintiffs.  An Amended Complaint was subsequently filed on February 25, 2003.

## II.  <u>DISCUSSION</u>

### A.  <u>Standard for Motion to Dismiss</u>

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for a dismissal based upon the pleader's "failure to state a claim upon which relief can be granted."  Since the long-established federal policy of civil litigation is to decide cases on the proofs, district courts generally disfavor Rule 12(b)(6) motions.  <u>Melo-Sonics Corp. v. Cropp</u>, 342 F.2d 856 (3d Cir. 1965); <u>Panek v. Bogucz</u>, 718 F. Supp. 1228, 1229 (D.N.J. 1989).

The applicable inquiry under Rule 12(b)(6) is well-settled. Courts are required to accept all well-pleaded allegations in the complaint as true and to draw all reasonable inferences in favor of the non-moving party.  <u>In re Rockefeller Center Prop., Inc. Sec. Litig.</u>, 311 F.3d 198, 215 (3d Cir. 2002) (internal citations omitted).  Rule 12(b)(6) does not countenance "dismissals based on a judge's disbelief of a complaint's factual allegations." <u>Neitzke v. Williams</u>, 490 U.S. 319, 326-27 (1989).  The inquiry is not whether a plaintiff will ultimately prevail in a trial on the merits, but whether the claimant is entitled to offer evidence to support their claims.  <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974).  Dismissal under Rule 12(b)(6) is not appropriate unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957);  <u>In re Rockefeller</u>

11

Center Prop., 311 F.3d at 215-16 (internal citations omitted).

Typically courts only look to the face of the pleadings in considering motions made under Rule 12(b)(6).  However, courts may examine a "'a document integral to or explicitly relied upon in the complaint' without converting the motion to dismiss into one for summary judgment.'" In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (internal citations omitted).  Accordingly, in ruling on Defendants' motion, the Court can and will consider documents referenced by Plaintiffs in the Amended Complaint.  In addition, the Court may also take judicial notice of stock price data, news articles, and SEC filings.  In re NAHC, Inc. Sec. Litig., 306 F.3d 1314 (3d Cir. 2002) (considering stock price data); Ierada v. Mylan Lab., Inc., 230 F.3d 594, 598 n.2, 3 (3d Cir. 2002) (taking judicial notice of news articles regarding an FDA settlement and stock price report); In re Rockefeller Center Prop., Inc., Sec. Litig., 184 F.3d 280, 293 (3d Cir. 1999) (on a motion to dismiss, district court may take judicial notice of "all public disclosure documents which are either required to be filed with the SEC or are actually filed with the SEC").

**B.   Standard for Pleading Securities Fraud**

**1.   Section 10b-5 Elements**

"Section 10(b) prohibits the 'use or employ, in connection with the purchase or sale of any security ... [of] any

manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe...'" <u>In re Ikon Office Solution, Inc.</u>, 277 F.3d 658, 666 (3d Cir. 2002).

Section 10(b) is enforced through Rule 10b-5, which creates a private cause of action for investors harmed by materially false or misleading statements.  In order to state a claim pursuant to Rule 10b-5, a plaintiff must allege that a defendant: (1) made a misstatement or an omission of a material fact (2) with scienter (3) in connection with the purchase or the sale of a security (4) upon which [plaintiffs] reasonably relied and (5) that [plaintiffs'] reliance was the proximate cause of [their] injury." <u>Id.</u> at 666; <u>Semerenko v. Cendant Corp.</u>, 223 F.3d 165, 174 (3d Cir. 2000) (internal citations omitted).

### 2.   Rule 9(b) Requirements

Rule 9(b) imposes a heightened pleading requirement for allegations of fraud.  Rule 9(b) states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b).  This particularity requirement has been rigorously applied in securities fraud cases.  <u>GSC Partners CDO Fund v. Washington</u>, 368 F3d 228, 237 (3d Cir. 2004); <u>In re Burlington Coat Factory</u>, 114 F.3d at 1417.

As applied to Rule 10b-5 claims, "Rule 9(b) requires a

plaintiff to plead (1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it be acted upon; and (5) that the plaintiff acted upon it to his damage." GSC Partners CDO Fund v. Washington, 368 F.3d 236; In re Rockefeller Center Prop., 311 F.3d at 216 (3d Cir. 2002) (internal quotations omitted).

### 3. The PSLRA's Requirements

The Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4 et. seq., imposes additional pleading requirements on plaintiffs in a securities case.  Under the PSLRA, plaintiffs alleging a Rule 10b-5 violation are required to "specify each statement alleged to have been misleading and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B); GSC Partners, 368 F2d at 237; In re Advanta, 180 F.3d at 530.  If a complaint fails to comply with the PSLRA's pleading requirements, dismissal is mandatory.  GSC Partners, 368 F.2d at 237.

### C.   Motion to Dismiss

Defendants contend that Plaintiffs fail to properly allege the elements of a Section 10(b) claim or to plead fraud with the requisite particularity.  Specifically, Defendants argue that (1)

14

the qui tam action and subsequent FDA investigation were not material and J&J had no duty to disclose them; (2) the Amended Complaint fails to adequately plead scienter; and (3) the Amended Complaint fails to adequately plead loss causation.  The Court addresses each of these arguments in turn.

### 1.   Materiality

In the context of a 10(b) claim, information is "material" if a reasonable investor would consider the information significant or if inclusion of the omitted fact would have altered the "total mix" of information available to investors. Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (expressly applying the Section 14(a) standard of materiality to the 10b context).

While materiality is traditionally a question for the trier of fact, a court may rule that an alleged omission is immaterial as a matter of law if the omission is so obviously unimportant to a reasonable investor that reasonable minds cannot differ on the question of materiality.  Ieradi v. Mylan Lab., 230 F.3d 594, 599 (3d Cir. 2000); Klein v. Gen. Nutrition Co., Inc., 186 F.3d 338, 342 (3d Cir. 1999).  In other words, "[a]n omission is immaterial as a matter of law if the facts omitted 'would have no more than a negligible impact on a reasonable investor's prediction of the firm's future earnings.'"  In re Rockefeller Center Prop., 184 F.3d at 289-90 (3d Cir. 1999) (quoting Burlington Coat Factory,

15

114 F.3d at 1427).

It is also well-settled that non-disclosure of material information will not give rise to Section 10(b) liability unless the defendant had an affirmative duty to disclose the particular information.  Burlington Coat Factory, 114 F.3d at 1432 ("possession of material nonpublic information alone does not create a duty to disclose it").

Here, Plaintiffs make several arguments concerning the materiality of the qui tam action and the FDA investigation. First, Plaintiffs argue that the qui tam action was material because of the "numerous indicia pointing to a causal relationship between the manufacture of Eprex and pure red blood cell aplasia." (Amended Compl., at 56.)  Essentially, Plaintiffs' theory is that because there might have been a connection between the occurrence of PRCA and the way that Eprex is manufactured, J&J was required to disclose claims that the company had engaged in some manufacturing improprieties.

Plaintiffs theory fails because a company has no duty to disclose unsubstantiated allegations of wrongdoing that are asserted in routine litigation.  In Bolger v. First State Fin. Svcs., for example, the district court held that a company had no duty to disclose unsubstantiated claims of mismanagement alleged in routine shareholder litigation. 759 F.Supp. 182, 194 (D.N.J. 1991) (internal citations omitted).

16

SEC regulations provide additional persuasive authority for finding that a company does not need to disclose routine litigation.  See Gen. Elec. Co. v. Cathcart, 980 F.2d 927 (3d Cir. 1992) (affirming dismissal of Section 14(a) securities fraud claim and citing C.F.R. § 229.103 for a finding that undisclosed litigation was immaterial); Gen. Elec. Co. v. Rowe, 1992 WL 277997 at *13 (E.D.Pa. Sept. 30, 1992) (dismissing Section 14(a) securities fraud claim and finding that company had no duty to disclose employee qui tam action); City of Philadelphia v. Fleming Co., Inc., 264 F.3d 1245, 1266-67 (10th Cir. 2001) (dismissing 10b-5 securities class action and citing 17 C.F.R. § 229.103 for a finding that failure to disclose litigation was immaterial).  Here, Arce alleged that he was forced to falsify data concerning water, fuel, and air compression measurements used in the operation of the plant's boiler.  Arce further claimed that he was fired in retaliation for threatening to inform the FDA of the false documentation. Notably, Arce's complaint contains no allegations linking these alleged improprieties to the occurrence of PRCA.  Regardless of the merits of Arce's claims, his allegations are the type asserted in ordinary litigation and would only have a negligible impact on a reasonable investor's estimation of J&J's financial prospects.

Plaintiffs also contend that the FDA investigation was

material because "given the surrounding uncertainties involving J&J's anemia drug and the proven importance of the drug to J&J's success, the conclusion of the investigation could very well have resulted in the end of the anemia drug's production and a tremendous blow to J&J's overall revenue and the value of J&J's stock." (Amended Compl., at ¶ 58.) In essence, Plaintiffs allege that the investigation was material because had the FDA uncovered serious manufacturing improprieties that were linked to the occurrence of PRCA, then the investigation might have had a negative impact on sales of Eprex and on J&J's overall financial performance.

No SEC regulation, however, requires the disclosure of an investigation relating to uncharged criminal conduct. See U.S. v. Matthews, 787 F.2d 38, 49 (2d Cir. 1986)(holding that General Counsel of company was not liable under Section 14(a) for failing to disclose that he was being investigated for uncharged criminal conduct); In re Teledyne Def. Contracting Derivative Litig., 849 F. Supp. 1369, 1383 (C.D.Cal. 1983) ("Directors and officers simply need not confess guilt to involvement in criminal conduct and breaches of fiduciary duties of care when such charges have not been brought, let alone proven") (internal citations omitted). Plaintiffs do not allege that J&J was ever indicted as a result of the FDA investigation. In fact, Plaintiffs do not allege that the FDA found any support for the allegations, let

18

alone any connection between the alleged manufacturing lapses and the occurrence of PRCA.  Instead, Plaintiffs pile one hypothetical on top of another.

Plaintiffs advance a second argument.  They assert that once J&J chose to speak publicly about Eprex and about PRCA, the failure to disclose the qui tam action and the FDA investigation rendered those public statements materially misleading. Plaintiffs are indeed correct that a duty to disclose allegations in a civil lawsuit or a government investigation may arise if failing to do so would render other disclosures materially misleading.  In re Sotheby's Holdings, Inc., 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000).  However, Plaintiffs' argument is merely conclusory.  Plaintiffs do not allege facts to show that J&J's statements, either before or during the Class Period, concerning Eprex's financial performance were inaccurate.  Likewise, Plaintiffs do not show that J&J's statements concerning PRCA were misleading in any way.

At most, Plaintiffs show that J&J failed to publicly speculate about a possible connection between the allegations set forth in the qui tam action and the occurrence of PRCA.  For purposes of the securities laws, however, mere speculation about a "possible" connection is insufficient to trigger a duty on the part of J&J to disclose the information.  See In re CDNOW, Inc. Sec. Litig., 138 F. Supp.2d at 635 (company had no duty to

19

disclose talks with auditors concerning the "possibility" of auditors issuing going concern qualification).

Indeed, the securities laws, while designed to encourage disclosure of material information, also seeks to discourage disclosure of contingent and speculative information which could confuse and mislead the public.  See Lewis v. Chrysler Corp., 949 F.2d 644 (3d Cir. 1991); see also Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628 (3d Cir. 1989) (affirming dismissal in part and holding that company's failure to disclose certain future risks were so speculative and unreliable as to be immaterial as a matter of law); Zucker v. Quasha, 891 F.Supp. 1010, 1018 (D.N.J. 1995) ("Federal securities law does not require disclosure of facts that are purely hypothetical or not reasonably discoverable by the defendant."); In re Union Carbide, 648 F.Supp. 1322, 1328 (S.D.N.Y. 1986) (granting motion to dismiss and stating that a contrary holding "might encourage corporations to disclose trivial information not necessary for informed decision-making").  Not only was the connection between PRCA and the qui tam action speculative at the time of the alleged omission but, to date, the alleged connection remains entirely unsubstantiated.

Finally, Plaintiffs also contend that the 16% decline in the price of J&J Stock following the disclosure of the FDA investigation and the qui tam action indicates that the market considered the information material.  Plaintiffs rely on the

20

notion that in an "'efficient market,' the concept of materiality translates into information that alters the price of the firm's stock.  See In re Burlington, 114 F.3d at 1425.  The Third Circuit has further explained, "to the extent that information is not important to reasonable investors, it follows that its release will have a negligible effect on the stock price."  Id.

Here, the price of J&J stock temporarily dropped following the July 19, 2002 New York Times article, began to rise the following day when J&J issued a press release explaining that there was no connection between the qui tam action and PRCA, and then fully recovered within six trading days.  Plaintiffs have not cited any case law to establish that such a drop is anything other than negligible for the purpose of determining materiality.

Plaintiffs' failure to establish that the alleged omission was material is a sufficient basis for granting Defendant's motion to dismiss.  However, the Court will also address the issues of scienter and loss causation.

### 2.    Scienter

Plaintiffs may establish a "strong inference" that Defendants acted with "scienter" by either: (1) alleging facts to show that defendants had both motive and opportunity to commit fraud; or (2) alleging facts that constitute strong circumstantial evidence of conscious behavior or recklessness.  GSC Partners, 368 F.3d at 237 (citing In re Burlington, 114 F.3d at 1418.).

21

In the Amended Complaint, Plaintiffs allege a number of facts to support their claim that Defendants acted with the requisite intent.  These facts include: (1) by the Fall of 2001, J&J was aware of incidences of PRCA in patients taking Eprex; (2) J&J knew that PRCA might be linked to the way Eprex is manufactured; and (3) J&J knew that the <u>qui tam</u> action alleged certain improprieties concerning the conditions in which Eprex is manufactured. Plaintiffs further allege that Defendants knew that: (1) "producing a biological product like Eprex was likened to reproducing a snowflake;" (2) Eprex was facing competition from a new anemia drug; and (3) that the company's license rights to Procrit and Eprex were material to the company's bottom line. (Amended Compl., at ¶ 79-98.)

Plaintiffs do no more than provide a laundry list of disjointed facts, topped off with conclusory statements that Defendants had a motive and opportunity to commit securities fraud. Such conclusory statements are insufficient to support an inference of scienter.  <u>See</u> <u>In re Advanta</u>, 180 F.3d at 539 (holding that "conclusory assertions that defendants acted 'knowingly'" were insufficient to support a strong inference of scienter).

Similarly, Plaintiffs allege that "[a]ll Defendants, given their substantial holdings, were strongly motivated to conceal the government's investigation."  (Amended Compl., at ¶ 80.)  In the

Third Circuit, however, "catch-all allegations that defendants stood to benefit from wrongdoing" do not state facts with particularity or give rise to a strong inference of scienter.  GSC Partners, 368 F.3d at 237 (internal citations omitted).

Finally, to establish scienter Plaintiffs point to the fact that J&J's Vice Chairman, Robert Wilson, disposed of 100,000 shares of personally owned J&J stock on April 18, 2002.  However, fraudulent intent cannot be inferred from the mere allegation that some officers sold stock.  In re Advanta, 180 F.3d at 540.  Instead, Plaintiffs carry the burden of pleading specific facts demonstrating that the stock sales were unusual in timing and scope.  Id. at 540; Burlington Coat Factory, 114 F.3d at 1424; In re Party City Sec. Litig., 147 F. Supp.2d 282, 313 (D.N.J. 2001).  In their Amended Complaint Plaintiffs do not allege that Mr. Wilson was aware of the FDA investigation at the time of the sale.  In fact, Mr. Wilson sold his shares prior to the FDA's announcement that it was seeking a stay of the qui tam action.  The bare assertion that Mr. Wilson sold stock "around the time" of the FDA investigation does not satisfy the requirement that Plaintiffs plead specific facts demonstrating that the stock sales were unusual.

**3.  Loss Causation**

The PLSRA codifies the long established requirement that private plaintiffs in a securities fraud action must prove that

"the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).

In the Third Circuit, in order to survive a motion to dismiss, plaintiffs must plead loss causation by alleging facts demonstrating that: (1) because of defendant's material omission or misstatement the price of defendant's stock was overvalued at the time of plaintiff's purchase; and (2) after a corrective disclosure the price of the stock declined. Semerenko v. Cendant Corp., 223 F.3d 165, 185-86 (3d Cir. 2000).[2] Here, Plaintiffs assert that: (1) each member of the Lead Plaintiff group purchased J&J securities or sold J&J put options in the open market at prices that were artificially inflated during the Class Period by Defendants' non-disclosure of the qui tam action and FDA investigation; and (2) the price of J&J's stock declined once this information was disclosed on July 19, 2002.

Defendants argue that Plaintiffs fail to plead loss causation because they fail to allege facts demonstrating that they suffered

---

[2]     The Circuits are currently in disagreement with respect to whether a plaintiff can withstand a motion to dismiss without alleging that there was a corrective disclosure.  In contrast to the Third Circuit, the Ninth Circuit has held that a plaintiff is only required to plead price inflation and does not need to allege that there was a corrective disclosure followed by a stock price drop in order to satisfy the loss causation requirement. Broudo v. Dura Pharm., Inc., 339 F.3d 933 (9th Cir. 2003), cert. granted, 174 S.Ct. 1625 (2004).  In June 2004, the Supreme Court granted certiorari to address the issue, but has not issued a ruling as of the date of this Opinion.

any actual monetary loss.  Defendants point out that four of the
five members of the Lead Plaintiffs' group purchased the relevant
shares during the Class Period, held the shares through the July
19, 2002 stock price drop, and continued to hold their shares as
J&J's stock price rebounded.  Defendants also point out that the
fifth member of the Lead Plaintiff group, JEI, bought and sold J&J
stock prior to the July 19 drop in price.

Defendants appear to be confusing the issue of whether
Plaintiffs have plead loss causation with the question of whether
Plaintiffs have suffered damages.  In <u>Newton v. Merrill Lynch</u>, the
Third Circuit stated that "it is necessary [..] to distinguish the
concept of economic loss from the issue of loss causation."  259
F.3d 154, 178 (3d Cir. 2001).  The Court went on to explain that
"loss causation derives its function from the standard rule in
tort law that the plaintiff must allege and prove that but for the
defendant's wrongdoing plaintiff would not have incurred the harm
of which he complains."  <u>Id.</u> at 177.

This Court is persuaded that under <u>Semerenko</u> a plaintiff is
only required to allege two things: inflated price and corrective
disclosure.  Plaintiffs satisfy this burden.  Defendants' argument
that Plaintiffs suffered no cognizable monetary loss and,
therefore, have not plead loss causation is misconstrued.

In any event, the Court's conclusion that Plaintiffs fail to
adequately plead materiality or scienter is sufficient ground for

granting Defendants' motion to dismiss.

### D.   Section 20 Claims

A Section 20 claim of "control person" liability requires that Plaintiffs adequately plead a primary violation of federal securities law.  In re Rockefeller Center Prop., 311 F.3d at 211-12.  In light of the deficiencies of Plaintiffs' Section 10(b) claims, Plaintiffs' claims against the Individual Defendants for Section 20 liability must also fail.

### E.   Plaintiffs' Request to Amend the Complaint

In a footnote in their brief in opposition to the motion to dismiss, Plaintiffs request leave to file a second amended complaint in the event that any portion of the first Amended Complaint is found deficient.  Plaintiffs' request for leave to file a second amended complaint is denied for three reasons. First, the request is not properly before the Court by way of a notice of motion.  Second, Plaintiffs have not submitted a copy of the proposed amended complaint in accordance with Local Rule 7.1(e)(2).  Third, such an amendment would be futile and is therefore unwarranted.  See e.g. Zucker v. Quasha, 891 F.Supp. at 1019; In re Donald Trump Sec. Litig., 793 F.Supp. 543, 568 (D.N.J. 1992).

**III. <u>CONCLUSION</u>**

For all the foregoing reasons, it is hereby **ORDERED** that

Defendants' motion to dismiss is **GRANTED,** and the Amended

Complaint is **DISMISSED** with prejudice.


<u>/s/ WILLIAM G. BASSLER</u>
UNITED STATES DISTRICT JUDGE

DATED: October 14, 2004

27